## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MAURINE HOWARD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-0352 |
| | § | |
| STATE FARM LLOYDS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION SETTING OUT
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Background

Maurine Howard sued State Farm Lloyds ("State Farm"), asserting that State Farm's response to her claim under her homeowner's insurance policy for mold damage in her home gave rise to causes of action for breach of contract, breach of duty of good faith and fair dealing, and violations of the Texas Deceptive Trade Practices Act ("DTPA") and articles 21.21 and 21.55 of the Texas Insurance Code. On March 31, 2005, State Farm sought leave from this court to amend to allege the affirmative defense of concealment and fraud and to assert a counterclaim under the Texas Insurance Code, TEX. INS. CODE art. 21.21, § 16(c), and the DTPA, TEX. BUS. & COM. CODE, § 17.41–17.63. State Farm alleged that Howard's claims against State Farm were groundless and brought in bad faith. (Docket No. 27). This court entered an order granting leave on April 7, 2005. (Docket No. 28). Howard did not file an answer to the counterclaim.

On May 18, 2005, State Farm filed a motion for summary judgment on the affirmative defense of concealment and fraud.  (Docket No. 37).  In the motion, State Farm alleged that Howard fraudulently obtained Alternative Living Expenses under her policy, in amounts far in excess of the actual expenses she incurred.  On June 7, 2005, Howard filed a response to the summary judgment motion.  The response included affidavits signed by Howard and her mother, Henrietta White.  (Docket No. 44).  Attached as exhibits to the affidavit were several documents.  On June 17, 2005, State Farm filed a reply brief, objecting and moving to strike the affidavits and exhibits on a number of grounds, including their inconsistency with Howard's prior sworn testimony.  (Docket No. 47).  The court scheduled a hearing on all pending motions to take place on June 21, 2005.  (Docket No. 45).  Neither Howard nor her attorney appeared at the hearing.  The court entered an order to show cause requiring Howard and her counsel to appear on June 27, 2005 and show cause why the case should not be dismissed with prejudice.  The court also ordered certain witnesses with possible knowledge of the alleged fraud to appear.  (Docket No. 51).  In subsequent submissions and hearings, State Farm asserted that Howard altered evidence filed in this court in an attempt to preclude summary judgment and that she made fraudulent statements in two bankruptcy proceedings.

Howard failed to appear at the June 27, 2005 show cause hearing.  After offering an explanation for his client's absence, counsel told the court that the documents attached as exhibits to Howard's and White's affidavits were false and that he had been authorized by Howard to withdraw the exhibits from the record.  He further advised that Howard no longer wanted to pursue her claims against State Farm.  (Docket No. 57).  State Farm told the court

that it wanted to pursue its counterclaim against Howard.  The court ordered the parties and witnesses to reappear on July 7, 2005.  (Docket Nos. 53, 54, and 57).

On July 6, 2005, the day before the second show cause hearing, Howard filed a *pro se* Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, resulting in an automatic stay of State Farm's counterclaim against Howard under 11 U.S.C. § 362(a).  Although this court proceeded with the July 7, 2005 show cause hearing, State Farm's counterclaim could not be addressed.  Howard appeared in person and through her attorneys, Tom F. Coleman and Sandra Pace Williams, and a criminal defense attorney, Chris Flood.  At the hearing, State Farm Lloyds appeared through its attorneys, Deborah Rank and Holly Kowis.  Others present included Howard's fiancé, Brian DeMary; Howard's cousin, Gay Sanford; and an attorney, Gerald Mace, who, with his firm, Mace & Mack, had been involved in some of the transactions relevant to the claim of fraudulently-obtained alternative living expenses.

This court gave State Farm and Howard the opportunity to question Sanford and Mace.  Howard and DeMary, however, invoked the Fifth Amendment and refused to answer State Farm's questions.  State Farm argued that an adverse inference was appropriately drawn on all matters about which Howard refused to testify.  State Farm argued that Howard had waived her Fifth Amendment protections by virtue of her prior inconsistent sworn testimony.

State Farm created a record of suspected fraud in connection with the Chapter 13 bankruptcy Howard filed in March 2001 and the Chapter 7 bankruptcy she filed on July 6,

2005.  (Docket No. 58, pp. 71–78).  This court granted Howard ten days to respond to the sanctions issues and the supplemental summary judgment record, which consisted of the testimony of Gay Sanford and Gerald Mace and the following exhibits: (1) Exhibit 1, the complete Mace & Mack records; (2) Exhibit 2, Assumed Name Certificate filed by Brian DeMary in September 2003; (3) Exhibit 3, Certified Copy of records from Howard's March 22, 2001 Chapter 11 Bankruptcy filing in the United States Bankruptcy Court for the Southern District of Texas, Cause No. 01-33062; and (4) Exhibit 4, contents inventories prepared by Howard in this litigation.  (Docket Nos. 55, 56, 58 (p. 79)).

Shortly after the July 7, 2005 show cause hearing, State Farm moved for relief from the automatic stay in the Bankruptcy Court under 11 U.S.C. § 362(d)(1).  On August 11, 2005, the Bankruptcy Court entered an order granting State Farm relief from the stay, allowing the litigation between Howard and State Farm to proceed.  The parties appeared before this court on August 19, 2005 and State Farm presented evidence.  Both parties filed post-hearing submissions.

Based on the pleadings, motions and responses, the parties' submissions, the evidence and arguments of counsel, and the applicable law, this court enters the findings of fact and conclusions of law set out below.  Based on those findings and conclusions, this court grants State Farm Lloyds' motion for summary judgment on the affirmative defense of concealment and fraud and enters judgment against Howard for State Farm attorneys' fees and costs.

**Findings of Fact**

Before March 2002, Howard, DeMary and White lived in a house in Houston, Texas, owned by Howard and insured by State Farm under a standard HO-B-Broad Homeowner's Policy (the "Policy").  (Docket No. 40, Defendant's Exhibit 1).  In March 2002, Howard reported a mold claim to State Farm.  Under the terms of the Policy, State Farm extended coverage to Howard for any additional living expenses ("ALE") she and her mother incurred as a result of their inability to live in the insured residence pending remediation.  (Docket No. 29, Defendant's Exhibit 2).

On April 1, 2002, Howard informed State Farm that she intended to meet with a realtor to arrange alternative housing.  On April 8, 2002, Howard informed State Farm that she, DeMary, and White had moved out of the insured residence and that she had located a house in Kemah, Texas ("Kemah residence") that she and White could rent for $4,500 a month.  (Docket No. 40, Defendant's Exhibit 2).

On April 12, 2002, Howard provided State Farm with a copy of a six-month Residential Lease for the Kemah residence that she had purportedly entered into with Triangle Trust.  (Docket No. 40, Defendant's Exhibits 2 and 4).  The lease, dated April 11, 2002, bore what appeared to be the signatures of Howard and Gay Sanford on behalf of the lessor, Triangle Trust.  (Docket No. 40, Defendant's Exhibit 4).  Howard also provided State Farm with a copy of a check in the amount of $12,500 made payable to Triangle Trust and signed by Howard.  (Docket No. 40, Defendant's Exhibits 2 and 5).  The check purportedly represented the first and last months' rent and deposits for the Kemah residence.  (Docket No. 40, Defendant's Exhibit 5).

Based on Howard's oral statements, the Residential Lease, and the $12,500 check she presented, State Farm issued an ALE payment to Howard in the amount of $18,070.11. This amount represented payment for three months' rent at $4,500 per month, deposits in the amount of $3,500, and other miscellaneous expenses Howard had reportedly incurred. (Docket No. 40, Defendant's Exhibit 2).

For the next two years, Howard repeatedly represented to State Farm that she needed the ALE benefits to pay rent on the Kemah house. With each payment, State Farm notified Howard that the money was for "rent," "housing rental," and/or utilities. (Docket No. 40, Defendant's Exhibits 7–10). During her Examination Under Oath ("EUO") taken by State Farm on April 1, 2003, Howard again represented that "we" – Howard, her mother (White), and her fiancé (DeMary) – had rented the Kemah residence. (Docket No. 40, Defendant's Exhibit 6, p. 123). State Farm paid Howard $4,500 a month plus additional varying amounts for utilities and other related living expenses, for total ALE benefits of $126,680 from April 2002 through April 2004. (Docket No. 40, Defendant's Exhibit 2).

After Howard filed this suit, State Farm discovered that Triangle Trust is a Texas Irrevocable Trust created at the request of Howard and White by attorney Gerald Mace in November 2000 for estate planning purposes. White is the trust beneficiary and Howard is the residual beneficiary and trustee. (Docket No. 40, Exhibit 11). In April 2002, without State Farm's knowledge, White and Howard began negotiating the purchase of the Kemah residence with the property owner, Metropolitan Mortgage & Securities Co. White entered into a Sales Agreement to purchase the property on April 11, 2002, the same day Howard

signed the Residential Lease.  Through an Early Possession Agreement White signed on April 18, 2002, White and Howard were able to take possession of the Kemah residence two months before the deed was transferred to White on June 17, 2002.  (Docket No. 40, Exhibits 12 and 13).  Howard testified that she intended the Kemah residence to be immediately transferred into Triangle Trust.  Mace confirmed during the show cause hearing that the transfer did not take place until 2005.  (Docket No. 58, p. 36).

Although State Farm was paying Howard $4,500 a month plus additional amounts for utilities and various other expenses, White's monthly mortgage payment for the Kemah residence was in fact only $1,156.90.  (Docket No. 40, Exhibit 15, No. 10).  Howard withheld this information from State Farm and continued to accept gross overpayments from State Farm for ALE for two years.  By the time State Farm stopped making ALE payments to Howard in April 2004, Howard had received and accepted $80,234.40 in overpayments (24 months multiplied by $3,343.10 ($4,500 less the $1,156.90 mortgage payment)).

State Farm also discovered after this suit was filed that Sanford is Howard's cousin. Howard testified in her deposition that Sanford was the temporary trustee of Triangle Trust when the Residential Lease was signed; that Sanford prepared and signed the lease on behalf of the trust; and that Sanford had accepted rent payments from Howard.  During the July 7, 2005 show cause hearing, Sanford testified that she never discussed the lease for the Kemah residence with Howard, that she had never seen the lease until a week before the hearing, that she did not prepare or sign the lease, and that she did not accept payments from Howard for her rental of the Kemah residence.  (Docket No. 58, pp. 10–13).  Mace confirmed that the

first and only time Sanford served as a temporary trustee of Triangle Trust was between October 2003 and August 2004.  (Docket No. 58, pp. 31–32).

State Farm also discovered that the check in the amount of $12,500 signed by Howard and made payable to Triangle Trust was never negotiated, and that Howard never made a rent payment to Triangle Trust during the two years she received ALE payments from State Farm. (Docket No. 40, Exhibits 16 and 17).  Rather, Howard deposited the ALE checks into a joint checking account that she had with White.  Howard used that account and the ALE funds deposited in it to pay various expenses, including the mortgage on the Kemah residence, homeowner's association dues on the insured residence, homeowner's insurance premiums on the insured residence, White's medical bills, mortgage payments on the insured residence, and mortgage payments on other houses owned by White and/or Howard.  (Docket No. 40, Exhibit 3b, pp. 188–92).  In March or April 2003, White purchased the insured residence and transferred it into Triangle Trust.  (Docket No. 40, Exhibit 3c, pp. 281–83).  Other real property owned by Howard and/or White has also been transferred into the Trust.  (Docket No. 58, pp. 34–35).

This court finds that Howard presented the Residential Lease and the check in the amount of $12,500, made payable to Triangle Trust, for the purpose of establishing an inflated and false amount of ALE benefits to be paid by State Farm under the Policy.  When Howard presented the Residential Lease to State Farm and during the two years State Farm issued ALE payments to Howard, Howard failed to disclose the true relationship among herself, Triangle Trust, Gay Sanford, and White; failed to disclose to State Farm the fact that

White had agreed to purchase and did purchase the Kemah residence; failed to disclose to State Farm the actual amounts Howard and White actually incurred in additional living expenses; and failed to disclose to State Farm the fact that the $12,500 check made payable to Triangle Trust was never negotiated, despite Howard's acceptance and negotiation of the $18,070.11 reimbursement check subsequently issued by State Farm.  For two years, Howard accepted $4,500 each month plus additional amounts for utilities from State Farm, even though she knew that the payments far exceeded the actual additional living expenses she and White incurred.  During the two years State Farm made ALE payments to Howard, Howard knew that the Kemah residence was not an asset of Triangle Trust and that White owned the Kemah residence.

Howard served as trustee of Triangle Trust from November 2000 through October 2003 and from August 2004 through the present.  When Howard sold the insured residence to White, it was transferred from White into Triangle Trust.  When the Kemah residence was transferred from White into Triangle Trust, Howard knew of State Farm's counterclaim against her.  When Howard was having her assets transferred into Triangle Trust, she knew of her substantial debts.

Although DeMary lived with Howard and White in the insured residence and in the Kemah residence, he never paid rent to Howard or White.  DeMary signed Gay Sanford's name to the Residential Lease without Sanford's authorization and with the knowledge that Howard intended to present the lease to State Farm for the purpose of establishing a false and inflated amount of ALE benefits to be paid by State Farm under the Policy.  DeMary signed

the "temporary appointment" attached as Exhibit D to Howard's Affidavit and as Exhibit B to White's Affidavit, knowing that the document was false and that Howard intended to present the document to the court in response to State Farm's motion for summary judgment on the affirmative defense of concealment and fraud.  Although DeMary filed an Assumed Name Certificate in September 2003 under the name "Blue Water Restoration," DeMary failed to disclose this information even though it was responsive to questions State Farm posed during his January 20, 2005 deposition.

Howard's friend, former business associate, and contractor, Jon Purcell, operates his company under the name "Blue Water Construction and Restoration."   In the schedules submitted by Howard to the Bankruptcy Court during her March 2001 Chapter 13 bankruptcy, Howard represented that Brian DeMary was a creditor to whom she owed a debt of $125,000.  (Docket No. 56, Exhibit 3).  This court finds that Howard never owed DeMary a debt of $125,000.

In the schedules submitted by Howard to the Bankruptcy Court during her March 2001 Chapter 13 bankruptcy, Howard represented that Jon Purcell was a creditor to whom she owed a debt of $250,000.  (Docket No. 56, Exhibit 3).  This court finds that Howard has never owed a debt to Jon Purcell in the amount of $250,000.

In the schedules submitted by Howard to the Bankruptcy Court during her March 2001 Chapter 13 bankruptcy, Howard represented that the value of the personal property was $6,875.00.  (Docket No. 56, Exhibit 3).   In the personal property inventory Howard submitted to State Farm in connection with this lawsuit, Howard represented that the

replacement value of her personal property was $341,759. (Docket No. 56, Exhibit 4). In the schedule Howard submitted to the Bankruptcy Court during her March 2001 Chapter 13 bankruptcy, Howard represented that the value of her artwork, antiques, and other collectibles was $2,500.00. (Docket No. 56, Exhibit 3). During her deposition in this case, Howard testified that her art collection includes an original Renoir, an original Rembrandt, and two original Picassos. Howard estimated the value of her art collection as above $100,000 and testified that she has owned this collection for more than ten years.

In the schedules Howard submitted to the Bankruptcy Court during her March 2001 Chapter 13 bankruptcy, she represented that the value of her household goods and furnishings, including audio, video and computer equipment, and other items, was $1,300.00. (Docket No. 56, Exhibit 3). In the personal property inventory Howard submitted to State Farm in connection with this lawsuit, she represented that the replacement value of her household goods and furnishings, including audio, video and computer equipment, and other items, is $190,234.00. (Docket No. 56, Exhibit 4).

In the schedules Howard submitted to the Bankruptcy Court during her March 2001 Chapter 13 bankruptcy, she represented that the value of her clothing and jewelry was $2,700.00. (Docket No. 56, Exhibit 3). In the personal property inventory submitted by Howard to State Farm in connection with this lawsuit, she represented that the replacement value of her clothing, including multiple fur coats, is $99,850.00. (Docket No. 56, Exhibit 4). In the Chapter 7 bankruptcy petition Howard filed on July 6, 2005, she represented that the total value of her assets was between zero and $50,000.

In the schedules Howard submitted to the Bankruptcy Court during her March 2001 Chapter 13 bankruptcy, she represented that she received $1,500 a month in rent from Brian DeMary.  (Docket No. 56, Exhibit 3).  This court finds that DeMary never paid rent to Howard.

In the schedules Howard submitted to the Bankruptcy Court during her March 2001 Chapter 13 bankruptcy, she represented that she had a monthly income of $4,123.10, which included $1,500 in rental income from Brian DeMary, $995 in V.A. benefits, and $1,800 from her employer, Continental Airlines.  (Docket No. 56, Exhibit 3).  In the schedules Howard submitted to the Bankruptcy Court during her March 2001 Chapter 13 bankruptcy, she represented in a "Statement of Financial Affairs" that she had not received any income from any self-operated businesses for two years before the bankruptcy filing.  In the section of the form requiring her to list all of her businesses, she checked "none."  (Docket No. 56, Exhibit 3).  During her deposition in this case, Howard testified she lost significant income as a result of her inability to operate her home-based businesses, Taylor Howard International and Eye See Images, as a result of mold in the home.  Howard testified these businesses were profitable during the years before her March 2002 mold claim.

The court finds that there are significant discrepancies and inconsistencies among the representations Howard made during her 2001 Chapter 13 bankruptcy, the representations Howard made during her 2005 Chapter 7 bankruptcy, the representations Howard made through the documentation she submitted to State Farm in support of her claims, and the testimony Howard gave during her multiple depositions and in the affidavit she submitted

in support of her response to State Farm's motion for summary judgment on the affirmative defense of concealment and fraud.   This court finds that Howard is wholly without credibility.

## Conclusions of Law

Texas law governs construction of the Policy.  *See Consumers County Mut. Ins. Co. v. P.W. & Sons Trucking, Inc.*, 307 F.3d 362, 365 (5th Cir. 2002) ("Texas rules of contract interpretation control in this diversity case.").  Insurance contracts are subject to the same rules of construction as other contracts.  *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995); *National Union Fire Ins. Co. v. CBI Indus*., 907 S.W.2d 517, 520 (Tex. 1995).  The courts are to give effect to the written expression of the parties' intent. *Beaston*, 907 S.W.2d at 433.  All parts of the contract must be read together striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative.  *Id*.; *United Serv. Auto Ass'n v. Miles*, 161 S.W.2d 1048, 1050 (Tex. 1942).  If the policy and coverage provisions are not ambiguous, "courts must give the words their plain, ordinary and generally accepted meaning unless the policy shows that the words were meant in a technical or different sense."  *Fed. Deposit Ins. Corp. v. Firemen's Ins. Co. of Newark, N.J.*, 109 F.3d 1084, 1087 (5th Cir. 1997).

Under the Policy, when a loss makes an insured residence "wholly or partially untenable," State Farm will cover the "additional living expenses, meaning any necessary and reasonable increase in living expenses you incur so that your household can maintain its normal standard of living."  (Docket No. 40, Exhibit 1, p. 2).  The Concealment and Fraud

provision of the Policy provides, "This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance, made false statements or committed fraud relating to this insurance, whether before or after the loss." (Docket No. 40, Exhibit 1, p. 11). The Policy is void if the insured (1) intentionally concealed any material fact or circumstance, (2) intentionally misrepresented any material fact or circumstance, (3) made false statements relating to the insurance, or (4) committed fraud relating to the insurance. *McEwin v. Allstate Texas Lloyds*, 118 S.W.3d 811, 815 (Tex. App.-Amarillo 2003, no pet.). The traditional elements of fraud are (1) a material representation; (2) that was false; (3) that the speaker knew the representation to be false or made it with reckless disregard of the truth; (4) the speaker made it with the intention that it be acted on by the other party; (5) the other party acted in reliance on it; and (6) the other party suffered injury. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).

Howard submitted the fraudulent Residential Lease and $12,500 check payable to Triangle Trust for the purpose of, and with the intent to, establish ALE benefits that far exceeded the amount of living expenses she actually incurred, in violation of the Concealment and Fraud provision of the Policy.

The Residential Lease was false in the following respects: (1) there was no agreement between Howard and Triangle Trust to lease the Kemah residence for any amount; (2) Triangle Trust did not own the Kemah residence; (3) Sanford was neither the trustee nor a representative of Triangle Trust; (4) Howard and Sanford never discussed the lease; and (5)

Sanford's name was forged on the lease.  Howard intentionally withheld and/or concealed material facts and circumstances in an effort to procure false and inflated ALE benefits under the Policy, in amounts far exceeding her actual living expenses, in violation of the Concealment and Fraud provision of the Policy.  Howard made material misrepresentations to State Farm relating to her additional living expenses, in violation of the Concealment and Fraud provision of the Policy.  Howard knew that her representations to State Farm relating to her additional living expenses were false.  Howard made the material misrepresentations with the intention that they be acted on by State Farm.  State Farm reasonably relied on Howard's representations in issuing substantial ALE payments to Howard for a period of two years, which resulted in injury to State Farm.

Howard wrongfully accepted $4,500 each month, plus additional amounts for utilities, from State Farm, knowing that the payments far exceeded her additional living expenses, in violation of the Concealment and Fraud provision of the Policy.  Howard committed fraud relating to the ALE benefits provided by her Policy.  State Farm has met its burden on each element of its affirmative defense of Concealment and Fraud.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Howard failed to raise a genuine issue of disputed material to determining fraud.  The competent, credible, and uncontroverted summary judgment evidence establishes that she violated the Concealment and Fraud provision of the Policy in connection with her ALE claim.  This court grants State Farm's motion for summary judgment.  Howard's violation of the

Concealment or Fraud Clause voids the Policy as to all coverages.  *See Texas Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 878 (Tex. 1999) ("Concealment or Fraud" provision includes a "condition or bar to coverage for all insureds if any one of them commits fraud or intentionally conceals or misrepresents a material fact"); *McCullough v. State Farm Fire & Cas. Co.*, 80 F.3d 269, 271 (8th Cir. 1996) ("We agree with State Farm that the plain meaning of the "concealment, misrepresentations, or fraud clause in the policy . . . was clear: that the entire policy would be immediately void . . . .").

If a court finds that an action under the Insurance Code and DTPA was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment, the court shall award to the defendant reasonable and necessary attorneys' fees and court costs.  TEX. INS. CODE ANN. art. 21.21 § 16(c); TEX. BUS. & COMM. CODE ANN. § 17.05(c).  This court concludes that Howard's Insurance Code and DTPA claims against State Farm were groundless and brought in bad faith.

State Farm is entitled to recover attorneys' fees and court costs incurred in defending the bad faith allegations and in pursuing the counterclaim.  State Farm must submit its fee application, consisting of the affidavit previously filed and copies of the underlying billing records, redacted to remove privileged and protected material, within 14 days after the entry of judgment.  Howard's objection to the affidavit is overruled.

This court also concludes that under Rule 56(g), a court may order the party employing an affidavit submitted in bad faith to pay the amount of the opposing party's expenses, including reasonable attorneys' fees.  FED. R. CIV. P. 56(g).  This court finds that

Howard submitted affidavits in bad faith in response to State Farm's motion for summary judgment on the affirmative defense of concealment and fraud.  Howard also submitted admittedly false documents as exhibits to her affidavit, including the following:  (1) the April 9, 2002 letter to Sanford from Howard attached as Exhibit A to Howard's affidavit; (2) the April 12, 2002 letter to Howard from Sanford attached as Exhibit C to Howard's affidavit; (3) the "temporary appointment" attached as Exhibit D to Howard's affidavit and as Exhibit B to White's affidavit; and (4) the Residential Lease containing a "Received" stamp which is dated "4/11/2002."  Howard's affidavit contained factual allegations that are based on false documents and that contradict Howard's previous deposition testimony.  The affidavits of Howard and White are "sham" affidavits, which Howard submitted knowing that they were false.

Under Rule 56(g) of the Federal Rules of Civil Procedure, this court orders Howard to pay State Farm's expenses, including reasonable attorneys' fees.  State Farm may submit its application for such fees no later than 14 days after judgment is entered.

This court finds that an adverse inference is appropriately drawn from Howard's invocation of the Fifth Amendment privilege and refusal to testify during the July 7, 2005 show cause hearing.  *Baxter v. Palmigiano*, 425 U.S. 308 (1976); *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983); *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1464 (5th Cir. 1992); *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 673–74 (5th Cir. 1999). By voluntarily offering testimony through multiple depositions and through her affidavit submitted in response to State Farm's motion for summary judgment on the affirmative

defense of concealment and fraud, Howard waived her right to invoke the Fifth Amendment in response to questions by State Farm during the July 7, 2005 show cause hearing related to matters about which she previously testified.  *Brown v. United States*, 56 U.S. 148, 78 S. Ct. 622 (1958); *Nutramax Labs., Inc. v. Twin Labs., Inc.*, 32 F. Supp. 2d 331 (D. Md. 1999).

This court also finds that Howard committed fraud in connection with representations she made as to the value of property in this case, in documents submitted to the Bankruptcy Court in *In re Maurine Howard d/b/a Shady Brook*, Cause No. 01-33062-H4-11, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, and in documents submitted to the Bankruptcy Court in *In re Maurine Carroll Howard*, Cause No. 05-40530, in the United States Bankruptcy Court for the Southern District of Texas.

State Farm has also sought sanctions from Howard.  Federal courts may sanction parties, and their attorneys, using the courts' inherent power to fashion and impose appropriate sanctions for conduct that abuses the judicial process.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991).  Federal courts may use their inherent power when the parties' conduct is not controlled by other mechanisms.[1] *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1408 (5th Cir. 1993).  Federal courts may use their inherent power to sanction parties and their attorneys when they have practiced fraud on the court.

---

[1]Federal courts may sanction parties and their attorneys under the Federal Rules of Civil Procedure for filing frivolous motions and pleadings (Rule 11), filing frivolous or unreasonable discovery requests and responses (Rule 26g), failing to participate in pretrial conferences (Rule 16(f)), and for refusing to obey discovery orders and make mandatory disclosures (Rule 37(b)–(c)).  Federal courts may also sanction parties and their attorneys pursuant to federal statutes for contempt of court (18 U.S.C. §401) and for unreasonably and vexatiously multiplying court proceedings (28 U.S.C. §1927).

*Boland Marine & Mfg. Co. v. Rihner,* 41 F.3d 997, 1005 (5th Cir. 1995).  Specifically, courts may use their inherent power to sanction parties for destroying or altering relevant evidence, *Pressey v. Patterson*, 898 F.2d 1018, 1023–24 (5th Cir. 1990), and for lying under oath. *Brady v. United States*, 877 F. Supp. 444, 452–53 (D. Ill. 1994).

The primary purpose of sanctions is to deter frivolous litigation and abusive tactics. *Chambers*, 501 U.S. at 32; *Pavelic & Le Flore v. Marvel Entertainment Group,* 493 U.S. 120, 126 (1989).  The sanction imposed must be "the least severe sanction adequate to achieve the purpose of the rule under which it was imposed."  *Chambers*, 501 U.S. at 44; *Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 411 (5th Cir. 1996); *Natural Gas Pipeline Co.*, 2 F.3d at 1406–07.  "When a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions."  *Carroll v. The Jacques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997).  In order to impose sanctions against a party under its inherent power, a court must make a specific finding that the party acted in bad faith.  *Toon v. Wackenhut Corr. Corp.,* 250 F.3d 950, 952 (5th Cir. 2001) (citing *Goldin v. Bartholow*, 166 F.3d 710, 722 (5th  Cir. 1999)).  The court is "to conduct an independent investigation in order to determine whether it has been the victim of fraud."  *Chambers*, 111 S. Ct. at 2132. Courts have the authority to make credibility determinations to resolve whether such misconduct has occurred.  *See Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 808–09 (5th Cir. 2003); *Carroll*, 110 F.3d at 293; *Matter of United Markets Int'l, Inc.*, 24 F.3d 650, 655 (5th Cir. 1994).

This court finds that Howard committed fraud on this court by submitting admittedly false documents and sham affidavits in conjunction with her response to State Farm's motion for summary judgment on the affirmative defense of concealment and fraud, and for the numerous acts of perjury committed during her November 19, 2004, January 19, 2005, and April 20, 2005 depositions.  This court finds that Howard has acted in bad faith.  She has already been ordered to pay the attorneys' fees defendant incurred in defending the bad faith claims and prosecuting the counterclaim.  The Policy has been declared void and her claim dismissed with prejudice.  None of those measures separately sanction her for altering relevant evidence or for perjury.  The least severe sanction adequate to achieve the purpose of deterring frivolous, bad faith litigation and abusive tactics is to require Howard to repay the $80,234.40 that State Farm paid her because of the fraudulent documents she provided them and later filed in this court and the fraudulent statements she made to State Farm and later repeated under oath in this litigation.  The sanctions are imposed under this court's power to address perjury and fraud.

Any findings of fact that are more properly conclusions of law are so deemed.  Any conclusions of law that are more properly findings of fact are so deemed

Final judgment will be entered by separate order.  Counsel for State Farm is to present a proposed final judgment within ten days from the date this order is entered.

SIGNED on October 13, 2005, at Houston, Texas.

Lee H. Rosenthal
United States District Judge